IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DEMARKULES WILLIAMS,      )
                          )
        Plaintiff,        )
                          )
vs.                       )        CIVIL ACTION NO. 1:19-235-TFM-MU
                          )
JEFFERSON DUNN, *et al.*, )
                          )
        Defendants.       )

## REPORT AND RECOMMENDATION

Plaintiff DeMarkules Williams, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). This matter is before the Court on Defendants' motion for summary judgment.[1] (Doc. 57). For the reasons discussed herein, it is recommended that this motion be **DENIED** as to the failure to protect claims asserted against Defendants Dunn, Stewart, Bolar, and Brown, and **GRANTED** as to all remaining claims.

## I. BACKGROUND AND FACTUAL ALLEGATIONS[2]

### A. Complaint.

Plaintiff Williams filed this action against Defendants, Alabama Department of Corrections Commissioner Jefferson Dunn, Warden Cynthia Stewart, Captain Regina

---

[1]     The Court converted Defendants Dunn, Stewart, Bolar, Brown, and Thompkins' Answers and Special Reports to a motion for summary judgment. (Docs. 35, 36).

[2]     Because Plaintiff's complaint was signed under penalty of perjury (*see* Doc. 1 at 8), the Court will consider the factual allegations in the complaint in ruling on the motion for summary judgment. *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (per curiam). However, the undersigned notes the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riveria Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

Bolar, Lieutenant Deveron Brown, Correctional Officer Curtis Thompkins, and Cubicle 2 Officer D. Winner, for failing to protect him from an inmate attack at Holman Correctional Facility ("Holman") on April 26, 2019.[3]

Williams alleges he was stabbed multiple times for an unknown reason by approximately eleven inmates, resulting in injuries which required that he be air lifted to a medical trauma center for treatment. Williams claims that despite observation cameras in the dorm and a manned cubical, no officer came to his assistance during the attack. Williams further alleges that (1) his medical treatment was delayed for the purpose of interrogating him and (2) following his hospitalization, he was returned to the same housing unit and was not provided psychological counseling or trauma aftercare treatment.

Williams is suing Defendants for their failure to protect him from the inmate-on-inmate attack in violation of the Eighth Amendment. Specifically, Williams is suing:

1. Alabama Department of Corrections Commissioner Jefferson Dunn for failing to hire officers to secure and protect the inmates and for failure to reasonably reduce the overcrowding of the prison population. (Doc. 1 at 5).

2. Holman Correctional Facility Warden Cynthia Stewart for failing to take reasonable measures to ensure the safety of inmates, with such failing resulting in allegedly more than 56 inmate stabbings since June 6, 2018. (Doc. 1 at 5).

3. Captain Regina Bolar for failing to take reasonable actions to ensure Plaintiff's safety while knowing the conditions of confinement at Holman, specifically the risk to

---

[3]     When Williams filed his original complaint, he named "John Doe…the security person that operated cubical #2" as a defendant. (Doc. 1). He later amended his complaint to substitute "D. Winner" in place of "John Doe" as the correctional officer who worked in cubicle 2 on the date of the incident. (Doc. 16, 17). Although Williams identified Cubical 2 Officer as D. Winner and included D. Winner as a defendant in this action, documents produced by Defendants show that the Cubicle 2 officer on duty on the date of the incident alleged in the complaint was not named D. Winner. (Doc. 36-1 at p. 2). No one named D. Winner has been served in this action. *See* Docs. 18, 19, 30, 40, 51, 54). Because the undisputed evidence shows that no one named D. Winner was on duty the date of the incident, it is **RECOMMENDED** that all claims against D. Winner be **DISMISSED.**

inmates' health and safety (since she has been Captain since June 2018 and "many inmate attacks occurred on her shift"). (Doc. 1 at 5-6).

4. Lieutenant Deveron Brown for failing to take reasonable measures to protect Plaintiff, knowing the dangers at Holman since most of the attacks since June 2018 "occurred during her watch." Plaintiff further claims that Lieutenant Brown delayed his medical treatment following the attack by interrogating him when he was bleeding and in fear for his life, and she could have gotten all the information from the dorm's observation cameras or the on duty cubical officer. (Doc. 1 at 7).

5. Correctional Officer Curtis Thompkins[4] failed to take reasonable measures to stop the attack or get Plaintiff "out of the danger area." (Doc. 1 at 7).

Williams seeks $100,000 compensatory damages from each defendant, jointly and severally, $1,000,000 in punitive damages, and any other relief the court deems just and proper. (Doc. 1 at 8).

## B.  Defendants' Answers and Special Reports.

Defendants Dunn, Stewart, Bolar, Brown, and Thompkins have answered the suit and denied the allegations asserted against them. (Docs. 35, 36). Defendants maintain that on April 26, 2019, Inmates Birdsong and Hines began arguing in A-Dorm's TV room; the argument continued into the bunk area of A-Dorm and escalated into a physical altercation between Inmates Birdsong and Hines. As Inmate Hines punched Inmate Birdsong, other inmates began to stab Plaintiff Williams and Inmate Smith. The cube officer for Holman's A-Dorm called a code after noticing about half of the inmates in the dorm running toward the rear of the dorm where many inmates were fighting. Lieutenant Dailey and Officer Craft responded to the code and observed Williams and two other inmates (Inmates Birdsong and Smith) walking towards the dorm's entrance gate with blood on their shirts. The inmates were escorted to the health care unit for a medical

---

[4]     Williams identifies as a defendant in this action, Officer Thompson. (*See* Doc. 1 at 7). However, in answering this suit, it is apparent that the defendant officer's surname is Thompkins. (*See* Docs. 35, 36 at 3).

assessment. Thereafter, all three inmates were transported to the local hospital for medical treatment, and Williams was then airlifted to USA Medical Center in Mobile, Alabama. Plaintiff returned to Holman on May 2, 2019.

Defendants contend that Williams has failed to establish deliberate indifference to his safety or a serious medical need; thus, he has failed to show that Defendants failed to protect him or that he has been denied medical care in violation of the Eighth Amendment. They further argue that the supervisory officials are not liable for constitutional violations under the theory of *respondeat superior*. In support of their denials, Defendants have submitted personal affidavits in response to the allegations asserted against them, which are summarized as follows:

Commissioner Jefferson Dunn avers that he has no personal knowledge of the matters alleged in Plaintiff's complaint and has not received a grievance regarding the incident. He further avers that he does not handle the day-to-day operations at Holman. (Doc. 36-6).

Warden Cynthia Stewart avers that she was not present at Holman on April 26, 2019, when the incident occurred. She further avers that she acted to reduce violence and secure all inmates by providing every inmate incarcerated at Holman with a handbook, designed to be a guide for institutional living, setting forth the major rules, regulations, and policies of state prisons. She asserts that Plaintiff's failure to abide by the rules of the handbook and Department of Corrections (that is his "decision making, continue[d] affiliation and engaging in activities [] not prescribed by the ADOC") caused him to be "associated" with the incident subject of this suit. She declares that she has several procedures in place to mitigate incidents of violence, including (1) bi-weekly presence of the Correctional Emergency Response Team, (2) a supervisor's presence in population, (3) frequent, unannounced searches of inmate's person, quarters, and other areas of the prison to ensure the safety of the inmates, (4) all officers are required to conduct five random searches daily of the inmates, their personal property, and their assigned living area, (6) monthly area searches of the institution are conducted and vary by times and patterns, and (7) correctional officers are responsible for monitoring inmates' behavior and activities and for patrolling their assigned areas. Warden Stewart affirms that a correctional officer and supervisor were assigned as rovers in population on the night of the incident, supported by the post assignment for April 26, 2019. (Doc. 36-2).

Captain Regina Bolar avers that she was previously employed as a Correctional Captain with the Alabama Department of Corrections. She avers she has no personal

knowledge of the matters alleged by Plaintiff regarding how the alleged conditions of Plaintiff's confinement contributed to and/or caused his assault. She affirms that on the night of the incident, she was the officer on call and responded to the incident upon notification of the inmate-on-inmate assault. She entered the facility and went to the health care unit to escort one of the other inmates to Atmore Community Hospital. She further affirms she had no communication with Plaintiff on the night of the incident. (Doc. 36-3).

Correctional Officer Curtis Thompkins avers that at the time of the attack subject of this complaint, he was the E-Dorm Rover. Officer Thompkins avers that the incident occurred in A-Dorm and Lieutenant Dailey and Officer Craft responded to the call for help. Officer Thompkins specifically avers that he was not present at the time of inmate Williams's attack. (Doc. 36-5).

Correctional Lieutenant Deveron Brown declares having no knowledge of the incident or being involved in the incident subject of this complaint. (Doc. 36-4).

Defendants have also submitted the Incident Report from April 26, 2019, which indicates that at approximately 10:15 p.m., Cubical 2 Officer, Dennis Pickett, called a code for Housing Unit A, to which Lieutenant Dailey and Officer Craft responded. (Doc. 36-1 at 5). The Report indicates that Plaintiff was stabbed in the middle back, suffering a stab wound, measuring 1 cm long by .5 cm wide (and that Inmates Birdsong and Smith received substantially more wounds).[5] (Doc. 36-1 at 5). According to the Incident Report, reviewed video footage identified 12 inmates as suspects participating in the stabbing of Plaintiff (and Birdsong and Smith), subsequent to an argument that originated in A-Dorm's TV room between Inmates Birdsong and Hines and escalated into the bunk area, where Williams was stabbed.[6] (Id. at 5-6)).

---

[5]    The Incident Report indicates that Inmate Birdsong received 14 puncture wounds to the back, 5 puncture wounds to the left upper arm, 2 puncture wounds to the upper right arm, 2 puncture wounds to the right wrist, 1 cm laceration to the forehead and facial area, and his left lung was diminished. (Doc. 36-1 at 3). Inmate Smith suffered 6 stab wounds to the lower left side, .2 cm deep puncture to his lower back, 1 cm puncture to left lateral arm, and 1.5 cm puncture to left side of head. (Id. at 3-4).

[6]    Defendants affirm that video footage revealed that the verbal argument in A-Dorm TV room escalated into A-Dorm when inmate Birdsong and inmate Hines went to their assigned living area and continued to argue near inmate Birdsong's bed. Inmate Hines became aggressive as

The handwritten statement of Cube 2 Operator Dennis Pickett reflects that at 10:15 p.m., he was "passing the trash bag to the hall runner from the door of Cube 2" when he "heard running in alpha dorm, noting about half the inmates in the dorm running toward the rear of the dorm on the low side where there were many inmates fighting" and he called a code, to which "Officers Craft, Lt. Dailey, Thompkins, and Hard approached alpha dorm quickly, and escorted two inmates that were injured up the hall to the hospital." (Doc. 36-1 at 6).

The Post Assignment Roster reflects that on the evening of April 26, 2019, all cubicles (1-5) were assigned officers, but there was no officer assigned to A-Dorm (or any dormitory). (Doc. 36-1 at 2). In general population, Officer Craft was assigned as B-Rover and Officer Thompkins as E-Rover, while Lieutenant Dailey was the shift commander on duty. In the segregation unit, Officers Hard, Boudreaux, and Lee were assigned as Rovers, with Officer Kelley assigned as Rover for death row, and Lieutenant Brown was the shift commander on duty. (*Id.*).

Provided body charts support the suffered injuries claimed by Plaintiff and those identified in the Incident Report. (Doc. 36-1 at 7-9). The body chart further reflects that Officer Dailey escorted Williams to the health care unit, where he received examination and a body chart at 10:30 p.m. (*Id.* at 7). Also, institutional records reflect that when Plaintiff returned to Holman from the hospital on May 2, 2019, he was placed in the hospital ward, before returning to A-Dorm on May 9, 2019.[7] (Doc. 36-1 at 4; Doc. 36-7).

---

he was continuing to argue with inmate Birdsong. A physical altercation began between two beds that spilled out into the aisleway where both engaged in physical combat. As inmate Hines continued to punch inmate Birdsong, other inmates began to stab inmate Williams and still others began to stab inmate Smith. (Doc. 36 at 5).

[7] The institutional records reflect that a mental health referral form was completed for Plaintiff on May 2, 2019. (Doc. 36-7 at 2). It appears that the request is for an assessment

6

The court converted Defendants' answers and special reports (Docs. 35, 36) into a motion for summary judgment. (Doc. 57). Plaintiff has responded to Defendants' motion for summary judgment,[8] generally challenging the veracity of the Defendants' denials of knowledge or involvement of the incident and pointing to evidence within and outside of the record to overcome summary judgment. (Doc. 66).

## II. SUMMARY JUDGMENT STANDARD.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

pending Plaintiff's housing in the segregation unit. Given that Plaintiff was placed in general population on May 9, 2019, the mental health screening was "unnecessary". (*Id.*).

[8] Prior to the Court's conversion of Defendants' Answer and Special Report into a Motion for Summary Judgment, Plaintiff filed pleadings, three personal "Declarations" (Docs. 38, 42, 44) and a Rebuttal to Special Report (Doc. 43), as well as a "Set of Interrogatories" directed to Defendant Warden Cynthia Stewart (Doc. 10). These materials will be considered in deciding the present motion for summary judgment to the extent they would be admissible at trial or Plaintiff has pointed out the evidence necessary to establish his claim and explained why he cannot present it to the court at this time.

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc*., 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc*., 64 F.3d 590, 593–94 (11th Cir. 1995) (per curiam) (quoting *Celotex*, 477 U.S. at 324). "To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." *LaChance v. Duffy's Draft House, Inc*., 146 F.3d 832, 835 (11th Cir. 1998) (citations omitted). In other words, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In considering whether the Defendants are entitled to summary judgment in this case, the Court views the facts in the light most favorable to Plaintiff. *See Comer v. City of Palm Bay, Fla.*, 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party."). The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. *Garczynski*, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to material facts.'" *Id.* (citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence to defeat a motion for summary judgment. *Id.* In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations.").

### III. DISCUSSION AND ANALYSIS

## A. IMMUNITY DEFENSES

To the extent Plaintiff attempts to sue Defendants in their official capacities (as the Commissioner of the Alabama Department of Corrections and state correctional officers) and seeks any type of monetary award, the defendants are entitled to absolute immunity from suit, as official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).

> A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

*Id.*, quoting in large measure *Lancaster v. Monroe Cnty*, 116 F.3d 1419, 1429 (11th Cir. 1997). Accordingly, Defendants, all employed by the State of Alabama, are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429.

Defendants further contend, to the extent they are sued in their individual capacities, that they are entitled to qualified immunity because Plaintiff cannot show a deliberate indifference claim under the Eighth Amendment. (Doc. 35, 36). "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Marbury v. Warden,* 936 F3d 1227, 1232 (11th Cir. 2019) (citation omitted). Since there is no dispute

that the defendants in this action were acting within their discretionary authority when the acts in question occurred, the burden shifts to Plaintiff to show that Defendants violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id*. Therefore, the Court will address whether this action identifies any constitutional violation.

**B. EIGHTH AMENDMENT FAILURE TO PROTECT**

As noted above, Williams seeks redress pursuant to 42 U.S.C. § 1983 for an alleged violation of his Eighth Amendment rights. (*See* Doc. 1). The Eighth Amendment, applicable to the states through the Fourteenth Amendment, governs the conditions under which convicted prisoners are confined and the treatment they receive while in prison. *Estelle v. Gamble*, 429 U.S. 97, 101 (1976); *see also Bass v. Perrin*, 170 F.3d 1312, 1316 (11th Cir. 1999). "'[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (some internal quotation marks omitted). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Additionally, "[b]eyond just restraining prison officials from inflicting 'cruel and unusual punishments' upon inmates, '[t]he Amendment also imposes duties on these officials, who must ... "take reasonable measures to guarantee the safety of the inmates."'" *Bowen v. Warden Baldwin State Prison,* 826 F.3d 1312, 1319-20 (11th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

Under the Eighth Amendment, prison officials have a duty to "ensure reasonable safety" of inmates, "a standard that incorporates due regard for prison officials' unenviable

task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 844-845.  However, "a prison custodian is not the guarantor of a prisoner's safety", *Purcell ex rel. Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (citation omitted), and "[i]t is not[] every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834.  While prison officials must "take reasonable measures to guarantee the safety of the inmates", *Hudson*, 468 U.S. at 526-27, there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not. . . ." *Farmer*, 511 U.S. at 838.  It is a defendant's deliberate indifference to a known, significant risk that violates the Eighth Amendment.  *Lane v. Philbin*, 835 F. 3d 1302 (11th Cir. 2016).

"A prison official violates the Eighth Amendment 'when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond reasonably to the risk.'" *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (emphasis in original) (citation omitted). Thus, to survive summary judgment on a failure-to-protect claim, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (quotation omitted).

The first element — a substantial risk of serious harm — is measured against an objective standard. *Caldwell*, 748 F.3d at 1099. Under this standard, the alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010)

(per curiam). The second element — the prison official's deliberate indifference to the risk — "has both a subjective and an objective component." *Marbury v. Warden,* 936 F3d 1227, 1233 (11th Cir. 2019). "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" *Caldwell*, 748 F.3d at 1099 (citation and alterations omitted). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. To meet the objective component, a plaintiff must produce evidence that the defendant disregarded the known substantial risk by failing to respond to it in an objectively reasonable manner. *Caldwell*, 748 F.3d at 1099. "The known risk of injury must be 'a strong likelihood, rather than a mere possibility' before a [prison official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (citations omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" *Id*. Where more than one defendant is alleged to have been deliberately indifferent, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). The third element — causation — requires a plaintiff to demonstrate a link between a defendant's act or omission and the excessive risk of harm, and a link between the risk of harm and the plaintiff's injury. *LaMarca v. Turner*, 995 F.2d 1526, 1538-39 (11th Cir. 1993).

### 1. Correctional Officer Thompkins

Williams alleges that Correctional Officer Curtis Thompkins failed to take reasonable measures to stop the attack or get Plaintiff "out of the danger area." (Doc. 1

at 7). Through his personal affidavit, Officer Thompkins maintains that he was not deliberately indifferent to a known substantial risk of serious harm to Williams on April 26, 2019, because he was not present at the time of the incident. First, relying on the Post Assignment Roster, Officer Thompkins avers he was assigned as E-Dorm rover. Second, Officer Thompkins points to the fact that his name "was never mentioned in the Incident Report" as proof that he was not present at the time of the attack. (Doc. 36-5). Williams does not dispute that Officer Thompkins was assigned as E-Rover at the time of the attack. Instead, Williams argues that the Post Assignment Roster only represents where an officer was assigned, not where an officer actually was. Furthermore, he points to the handwritten statement of Cubical 2 Officer Dennis Pickett, which (contrary to the Incident Report) states that in response to the called code, "Officers Craft, Lt. Daily, Thompkins, and Hard approached Alpha Dorm quickly. . . ." (Doc. 43 at 2, referring to Doc. 36-1 at 6). Taking as true for purposes of this motion that Officer Thompkins "was on the scene of the attack," the burden shifts to Williams to show that Officer Thompkins acted with deliberate indifference in failing to stop the attack. (Doc. 1 at 7); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) ("If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment." (internal quotation omitted)).

The test put forth in this Circuit to establish if liability may attach to an officer who fails to intervene in an inmate-on-inmate fight is whether: (1) the inmate's physical assault created a substantial, objective risk of injury, (2) of which a defendant is subjectively aware, (3) the defendant was in a position to intervene, and (4) the defendant did not respond reasonably to the risk of injury. *Johnson v. Boyd*, 568 F. App'x 719, 724-25 (11th

Cir. 2014). "Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (per curiam) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)). For liability to attach, however, "the officers must have been in a position to intervene." *Id*. In other words, "[a]n officer who fails to intervene in a fight between inmates can only be held liable if he 'was physically able and had a realistic chance to intervene and act in time to protect the inmate Plaintiff.'" *Seals v. Marcus*, 2013 WL 656873, at *7 (M.D. Ga. Jan. 25, 2013), report and recommendation adopted, 2013 WL 663579 (M.D. Ga. Feb. 22, 2013). The inmate plaintiff bears the burden of demonstrating that the correctional officer defendant "was in a position to intervene but failed to do so." *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (per curiam) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-31 (11th Cir. 2008)).

Here, Plaintiff vaguely asserts that Officer Thompkins was "on the scene" and failed to take reasonable measures to stop the attack or "get [him] out of the danger area." (Doc. 1 at 7). It is clear from the record that Officer Thompkins was not inside A-Dorm at the time of the attack, and Plaintiff provides no facts that could lead a trier of fact to reasonably conclude that Officer Thompson was in a position to act to stop the attack.[9] Namely, Williams fails to specify the duration of the attack, to describe Officer Thompkins' location in relation to the attack, to explain how Officer Thompkins could have responded, or to provide any facts indicating that Defendant Thompkins was in a position to intervene during the attack. There is no reason at the summary judgment stage of the case that

---

[9]     For purposes of this motion, the undersigned assumes that the facts submitted in the Incident Report and injuries confirmed in the medical records establish an objective risk of injury, to which an observer (here, Officer Thompkins), would have been aware if present at the scene of the incident.

Williams is unable to provide such affirmative evidence, including a personal affidavit or declaration. *United States v. Stein,* 881 F.3d 853, 857 (11th Cir. 2018) (*en banc*) ("[O]ur cases correctly explain that a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment."). "Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006); *see also, e.g.*, *Penley v. Eslinger,* 605 F.3d 843, 848 (11th Cir. 2010) (quoting *Scott v. Harris,* 550 U.S. at 381, n.8) (At this stage, the evidence and all reasonable inferences from the evidence are viewed in the light most favorable to the Plaintiff, as the nonmovant, but those inferences are drawn "only 'to the extent supportable by the record.'").

At best, the record supports that Officer Thompkins arrived at A-Dorm *after* the code was called by Cubicle 2 Officer Pickett. Thus, Plaintiff's barebones allegation falls short of his burden to present evidence that would allow a reasonable factfinder to find that Defendant Thompkins had the ability to intervene in the assault but failed to do so. *See Terry*, 376 F. App'x at 896 ("Terry claims that some prison officers were outside of the cubicle area where the altercation took place and merely watched he and Dorsey fight, but Terry does not allege facts indicating that the duration of the fight or the position of the guards were such that the guards would have been in a 'position to intervene.' . . . These deficiencies are fatal to Terry's claim for failure to intervene."); *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (holding that district court properly granted summary judgment to defendant correctional officer where plaintiff "presented no evidence that [officer] had the ability to reasonably insert himself between [the inmates]

to stop the assault without additional help" nor had he presented "evidence . . . as to how long this assault went on before intervention occurred.").

Accordingly, Williams has failed to establish an Eighth Amendment violation against Defendant Thompkins for failing to intervene and Defendant is entitled to qualified immunity on this claim.  Thus, it is recommended that summary judgment be **GRANTED** in favor of **Defendant Thompkins.**

### 2. <u>Commissioner Dunn, Warden Stewart, Captain Bolar, and Lt. Brown</u>

Williams is suing these Defendants for failing to take reasonable measures to ensure his safety, while having knowledge of the dangerous conditions at Holman.  Stated another way, Williams is alleging that he faced a generalized substantial risk of serious harm from inmate violence at Holman, of which Defendants were well aware.  The Eleventh Circuit has declared many times over that a claim of deliberate indifference based on a generalized risk of violence may only be established by showing "that serious inmate-on-inmate violence was the norm or something close to it[,]" which may be evidenced by "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence, tensions between different subsets of a prison population, and unique risks posed by individual prisoners or groups of prisoners due to characteristics like mental illness." *Marbury*, 936 F.3d at 1234-35 (internal quotation marks and citations omitted).

In *Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir. 1995), the Eleventh Circuit determined that the plaintiff had presented sufficient evidence of a generalized, substantial risk of serious harm from inmate violence to survive summary judgment where the record showed that prisoners were not segregated based on their proclivity for

violence; there was only one jailer on duty; the jailer's quarters were out of earshot and eyesight of the prisoners' cell; and fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization. *Id*. at 1581-84.

In *Marsh v. Butler County, Ala*., 268 F.3d 1014 (11th Cir. 2001) (en banc), the Eleventh Circuit held that the former inmate plaintiffs had sufficiently alleged conditions posing a substantial risk of serious harm to inmates when they alleged: 1) there was no segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, juveniles from adults, or inmates with mental disorders from those without mental disorders, 2) at times the Jail housed more prisoners than the cells could accommodate, 3) the Jail was routinely understaffed, 4) no head counts of prisoners were made to make sure they were all accounted for, 5) locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day, 6) homemade weapons were readily available by fashioning weapons from material torn from the dilapidated structure of the Jail, 7) no lock down of prisoners in their cells occurred at any point during the day or night, 8) cells were not visually inspected, 9) no jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed, 10) the Jail was not operated in accordance with written policies, 11) inmates were not screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail, and 12) prisoners were not disciplined or segregated when they attempted to escape, threatened jailers, destroyed property, or assaulted other inmates. *Id*. at 1029. The Court reasoned that, "[t]aken as a whole, these alleged conditions, if true, present an objectively substantial risk of serious harm—including the risk of inmate-on-inmate attacks—to inmates. This risk violates the Eighth Amendment's requirement 'that inmates be

furnished with the basic human needs, one of which is "reasonable safety.'" *Id*. (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)).

The Eleventh Circuit has specified that *Hale* and *Marsh* are not the "proverbial 'floor' of liability for Eighth Amendment purposes" but that the conditions evidenced by the records must be "sufficiently grave to violate the Constitution." *Purcell*, 400 F.3d at 1323. "Whether a substantial risk of serious harm exists so that the Eighth Amendment might be violated involves a legal rule that takes form through its application to facts." *Id*. at 1320. The cases below evidence facts courts have considered insufficient to establish that prison conditions "rose to the level of a 'substantial' or 'sufficiently serious' risk as opposed to some lesser risk of harm[,]" given that "[i]n the jail setting, a risk of harm to some degree always exists by the nature of its being a jail." *See id*. at 1323 (citation omitted).

In *Purcell*, the Court determined that the record did not support the plaintiff's contention that jail conditions posed the substantial risk of serious harm necessary for a constitutional violation where the inmates were segregated based on a number of particularized factors (including the type of crime committed and potential personal conflicts with others); the jail was properly staffed (with the typical number of five officers being on duty during the night of the subject attack); officials had a history of addressing and punishing inmate violence; the fights that occurred were not linked to any recurring specific cause; and the guards testified they periodically walked the cellblock. *Id*. at 1321-23.

In *Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014), the plaintiff adduced evidence of thirty-three incidents of inmate-on-inmate violence involving weapons over

the span of three-and-a-half years, four of which occurred in the same hallway where the plaintiff was assaulted, in a prison which housed between 830 and 990 inmates. *Id*. at 1299-1300. The Court concluded that the evidence presented was "hardly sufficient to demonstrate that [the facility] was a prison 'where violence and terror reign.' " *Id*. at 1300 (citation omitted).

In *Lorenzo v. Williams*, 2018 WL 3863529 (S.D. Ga. July 30, 2018), there was evidence that the prison had an average of six inmate-on-inmate assaults per month in a population of 1500-1600 in the year the decedent was attacked. *Id*. at *7. The district court concluded "that these superficial statistics [were] insufficient to demonstrate a substantial risk of serious harm to inmates at [the prison]." *Id*.

In *Marbury*, the plaintiff affirmed that he had personally witnessed fifteen apparently gang-related inmate stabbings prior to the incident in which he was stabbed, had sent a written request to the warden asking to be moved to another dorm (he described his dorm as an "over-rated gang affiliated block"), and had made several more in-person requests to be transferred. 936 F.3d at 1231. The Eleventh Circuit panel majority found the evidence insufficient to establish deliberate indifference based on a general risk of inmate-on-inmate violence. *Id*. at 1235. The panel majority expounded that in cases where the Eleventh Circuit had previously "held that a generalized risk of violence from a prison population could support a claim of deliberate indifference to a substantial risk of serious harm, the plaintiff has pointed to specific features of a facility or its population rendering it particularly violent." *Id*. The panel majority stated that although the record showed that inmates faced some risk of assaults by fellow prisoners, the plaintiff had failed to identify "specific features of the prison that would make it particularly violent."

*Id.*; *but cf. Dickinson v. Cochran*, 833 F. App'x 268, 275 (11th Cir. 2020) (per curiam) (finding that plaintiff sufficiently alleged "specific feature of the jail that render[ed] it particularly violent" where the plaintiff "alleged overcrowding, failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates").

Here, Williams alleges that 56 stabbings occurred at Holman in the ten months prior to his attack. He further references (1) a previous inmate riot where the inmates took control of the prison, stabbing and sodomizing Warden Davenport before the National Guard reclaimed control of the prison, and (2) the killing of Officer Bettis over an extra food tray. (Doc. 43 at 2, 4). Williams alleges that numerous video interviews of Defendant Dunn exist on "YouTube" to evidence that he had subjective knowledge of overcrowding at Holman and has refused to reasonably respond to hire staff to secure the prison or reduce the inmate population. (Doc. 43 at 4-5). Williams asks the question, how many incidents does it take to know that facility is understaffed, and measures taken are inadequate? (Doc. 42 at 3-4). Such allegations, however, are generalized, lacking context, dates, or any specific details necessary to allow the Court to reasonably conclude that violence is the norm at Holman, nor do his allegations identify specific features of Holman or its population which render it particularly violent. *See Marbury*, 936 F.3d at 1235. Although Williams' allegations show that there was clearly some risk of inmate-on-inmate violence at Holman due to high numbers of stabbings occurring in the year prior to the incident subject of this complaint, Williams has not produced evidence "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm." *See id.* Indeed, Williams has presented far less

evidence about the level of violence at Holman and, in particular, A-Dorm, than the evidence presented in both *Harrison* and *Marbury*, which the Eleventh Circuit found insufficient to show that inmate-on-inmate violence was so pervasive that it amounted to the substantial risk of serious harm necessary to support a deliberate indifference claim. Williams' allegations establish a mere possibility of injury, but they fail to carry his burden of establishing the strong likelihood of injury. *See Brown*, 894 F.2d at 1537.

Furthermore, Defendants have put forth testimony and evidence that every inmate incarcerated by ADOC is oriented with an inmate handbook that sets forth ADOC's rules, regulations, and policies, which are designed to help inmate population live together safely and as comfortably as possible. (Doc. 36-2). Defendants maintain that there are also procedures in place at Holman to help reduce incidents such as stabbings, for instance, frequent unannounced searches are conducted of each inmate's person, inmate living areas, and other institutional areas to ensure the safety of the inmates; all officers are required to conduct five random searches of the inmate population daily; and monthly area searches of the institution are also conducted. (Doc. 36-2). Moreover, the Post Assignment Roster for April 26, 2019, reflects that a correctional officer and a correctional supervisor were assigned as rovers in population.[10] (Doc. 36-2 at 2). Thus, the burden shifts to Williams to establish a causal connection linking the supervisory Defendants' actions to the alleged constitutional violation. *See Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (per curiam) ("Supervisory liability under section 1983 may be shown either by

---

[10] Williams argues that, with knowledge of the dangerous conditions at Holman, two roving officers to secure five general population units is insufficient and evidences deliberate indifference. (Doc. 43 at 2).

the supervisor's personal participation in the acts that comprise the constitutional violation

or the existence of a causal connection linking the supervisor's actions with the violation.").

> The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez*, 325 F.3d at [1234] (quoting *Braddy v. Fla. Dept. of Labor & and Employment*, 133 F.3d 797, 802 (11th Cir. 1998)); *Brown*, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's " 'custom or policy ... result[s] in deliberate indifference to constitutional rights' " or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at [1235] (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Hartley*, 193 F.3d at 1263; see *also Post v. City of Ft. Lauderdale,* 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at [1234] (internal quotation marks and citation omitted).

*Cottone v. Jenne*, 326 F.3d 1352, 1360-61 (11th Cir. 2003).

Williams's allegations are largely conclusory and reflect merely a generalized risk

of violence insufficient to rise to a constitutional violation. *See Brooks v. Warden*, 800

F.3d 1295, 1301 (11th Cir. 2015) (discussing that a "mere possibility" of harm is not

enough to state an Eighth Amendment claim and that "the plaintiff must plausibly allege

a strong likelihood of serious harm"). Notably, although he does allege that 56 stabbings

occurred at Holman in the ten months prior to his attack, Williams fails to specifically

allege the nature of any of the referenced inmate-on-inmate incidents at Holman, the

frequency of the incidents, the time frame in which the alleged incidents occurred, or any

particularized concerns regarding A-Dormitory. Williams also fails to identify any specific

features of Holman, A-Dormitory, or its population that make it particularly violent.

Ordinarily, Williams' sparse and generalized allegations simply do not demonstrate

a level of violence necessary to show an objectively substantial risk of serious harm or

Defendants' deliberate indifference to such risk, as required by this circuit's case law, and summary judgment should be granted in favor of the defendants. *Cf., Anderson*, 477 U.S. at 257 (Plaintiff bears the burden of presenting affirmative evidence to defeat a properly supported motion for summary judgment – even where the evidence is likely to be within the possession of the defendant, ***as long as the plaintiff has had a full opportunity to conduct discovery***.) (emphasis added). Here, however, the record shows that Williams has not had a full opportunity to conduct discovery to attempt to provide such necessary evidence because of his standing as a *pro se* plaintiff and incarcerated prisoner.  The record reflects that within days of Defendants being served with the complaint, Williams filed a "Set of Interrogatories" to Defendant Cynthia Stewart with the court and served the same upon the Defendant, asking questions such as: were there more than 35 inmate stabbings reported from June 2018 until May 2019; where is the security video-camera footage maintained; why were there padlocks and chain on the A-Dorm exit; how many inmate deaths were there at Holman from June 2018 to January 2020; how many of these deaths were prison homicides; what were the dates of the prison homicides from June 2018 through January 2020; what is the recommended number of officers to maintain reasonable security for inmates at Holman; from June 2018 until May 2019, what was the number of officers per shift at Holman; from June 2018 until May 2019, what were the average hours each officer worked at Holman; from June 2018 until May 2019 what was the number of officers working over-time duty; from June 2018 until May 2019, what was the total number of inmates at Holman; what number of inmates was Holman designed to adequately hold; what is the total number of officers working, now, at Holman?  (Doc.

10). To date, the interrogatories have gone unanswered,[11] and, in response to this motion, Williams declares under penalty of perjury that he is unable to obtain the necessary documentation to properly defeat summary judgment because his interrogatories have yet to be answered (and he is currently housed in the segregation unit without access to legal materials or the means to obtain witness affidavits or declarations).[12] (Doc. 38 at 1-2; *see also* Doc. 60).

It is obvious, in this case, that Williams has repeatedly sought to obtain specific evidence related to overcrowding, understaffing, and violent inmate-on-inmate attacks which occurred at Holman within one year prior to his stabbing to show "that serious inmate-on-inmate violence was the norm or something close to it[,]" which is generally evidenced by "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence. . . ." *Marbury*, 936 F.3d at 1234-35. Based on the questions presented, it is possible that Williams could discover specific facts to establish that he faced a strong likelihood of serious harm in A-Dorm of which Defendants were aware and that based on the risk of harm that one or more Defendants may be liable. Accordingly, "summary judgment should not be granted until [Williams,] the party opposing the motion, has had an adequate opportunity to conduct discovery." *Reflectone, Inc. v. Farrand Optical Co.,* 862 F.2d 841, 843 (11th Cir.1989). Simply put, "[i]f the

---

[11]     The Court notes that on August 23, 2021, it entered an order stating that Plaintiff was able to respond to the motion for summary judgment without a formal response to the interrogatories and made clear that "[i]f the Court determines that any of the requested information is necessary for its consideration, the Court will enter an order requesting the information from Defendants." (Doc. 61 at 1-2).
[12]     Williams further insists he needs "subpoena power" to obtain sufficient evidence from Defendants because "[t]he ADOC does a terrific job withholding incriminating evidence" identifying two Department of Justice Reports compiled in April and July 2020 which were purportedly unable to be completed because the ADOC was withholding valuable evidence from them. (Doc. 43 at 3, 5).

documents or other discovery sought would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials." *Snook v. Trust Co. of Georgia Bank of Savannah, N.A.,* 859 F.2d 865, 870 (11th Cir.1988).  Where district courts fail to honor these principles, appellate courts have not hesitated to find reversible error. *See, e.g., Jones v. City of Columbus, Ga.,* 120 F.3d 248, 253 (11th Cir.1997) (district court abused its discretion in deciding summary judgment motion where plaintiffs never had opportunity to examine requested documents or to depose defendant's witnesses); *Dean v. Barber,* 951 F.2d 1210, 1213-14 (11th Cir.1992) (district court abused discretion by granting summary judgment for defendant without ruling on plaintiff's motion to compel, such that summary judgment was entered on potentially inadequate record). Consequently, Williams should be allowed to seek the discovery information which may lead to specific facts related to his claim.  Notably, even if Williams is ultimately able to establish the objective and subjective prongs of his Eight Amendment claim, Defendants may still prevail on a subsequent motion for summary judgment, as "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the 1983 risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Accordingly, at this juncture, it is recommended that summary judgment be **DENIED** as to **Defendants Dunn, Stewart, Bolar, and Brown** as to the failure to protect claim asserted against them. It is further recommended that these Defendants be ordered to respond to Plaintiff's discovery request within 30 days of the order adopting this Report and Recommendation by mailing the responses to Plaintiff and by filing the responses in

this Court. After a review of the responses, the Court will determine if further discovery is warranted and, if so, will enter an appropriate order.

**C.** **Denial and/or Delay of Medical Care**

As previously noted, Williams claims that Lieutenant Brown delayed his medical treatment following the attack when she needlessly interrogated him (while he was bleeding and in fear for his life) when she could have gotten all the information from the dorm's observation cameras or the on duty cubical officer. (Doc. 1 at 7). Although Lieutenant Brown denies knowledge of this incident, for purposes of this motion, the court will "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown,* 392 F.3d 1283, 1288 (11th Cir.2004); *Johnson v. Governor of State of Fla.,* 405 F.3d 1214, 1217 (11th Cir.2005) (the court is obligated to construe the record, including all evidence and draw "all reasonable inferences, in the light most favorable to the non-moving party") (citation omitted).

"Delay in access to medical attention can violate the Eighth Amendment ... when it is tantamount to unnecessary and wanton infliction of pain." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9 (2002) (internal citations and quotation marks omitted). However, to succeed in proving that the delay of medical care rose to a constitutional violation, Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed...." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the

reason for delay. *Id.* at 1188-89 (internal citations omitted) (footnotes omitted); *see also, Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009). "To survive summary judgment, a plaintiff must show that the delay attributable to the defendant's indifference likely caused the plaintiff's injury." *Geobert v. Lee Cnty.*, 510 F.3d 1312, 1329 (11th Cir. 2007). Williams has failed to establish the detrimental effect of any alleged delay in medical treatment.

It is undisputed that the incident alleged in the complaint occurred at approximately 10:15 p.m. (Doc. 36-1 at 3). It is undisputed that three inmates were injured during the attack - Williams, Birdsong, and Smith. It is also undisputed that all three injured inmates were taken to the healthcare unit, where they received body charts, and were subsequently transported via ambulance to the local hospital. It is Williams's contention that Birdsong and Smith were removed from A-Dorm, while Williams remained and Lieutenant Brown stood at the "grill gate" demanding the names of the those responsible for stabbing Williams, thereby delaying his medical treatment. (Doc. 43 at 3, 5). However, the time stamps on the body charts reflect that Birdsong, who sustained the most stab wounds, was examined at 10:20 p.m. (Doc. 36-1 at 9), Williams was examined at 10:30 p.m. (*id*. at 7), and Smith was examined at 10:50 p.m. (*id*. at 8). The record further indicates that an ambulance arrived to transport the injured inmates to the local hospital at approximately 10:50 P.M. (*Id*. at 4), with Birdsong being transported via ambulance at 11:05 P.M., Williams next at 11:28 P.M., and, third, was Smith at 11:45 P.M. (*Id*. at 4). Consequently, any delay by Lieutenant Brown's questioning did not hinder Williams from being examined and taken to the hospital within minutes of Birdsong and before Smith (indicating the triage of medical treatment).

Furthermore, and fatal to his claim, Williams has failed to present sufficient factual allegations demonstrating how long he was questioned by Defendant Brown, any symptoms experienced during the alleged delay, as well as any worsening of symptoms while being interrogated by Defendant Brown. No evidence exists that Williams suffered when relief was readily available, *Boretti v. Wiscomb*, 930 F.2d 1150-1154-55 (6th Cir. 1991) (recognizing that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering."), and no evidence exists that Defendant Brown was made aware that Williams's injury required more immediate treatment than he received, or that Defendant Brown knowingly kept him from receiving necessary medical care. *McElligott v. Foley*, 182 F.3d 1248, 1257 ("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."). While Williams makes the conclusory allegation in an unsworn declaration that "[i]n attempt to inquire about the incident from Lt. Brown, Injuries were missed and got worse [causing him to be airlifted to a major trauma center]" (Doc. 44 at 1), Plaintiff fails to articulate what medical need was "missed" or worsened, nor does he provide how a timelier admission to the local hospital would have prevented his injury or reduced complications. It is well settled that a conclusion cannot be taken as true, and the Court will not accept conclusory allegations as facts in consideration of a motion for summary judgment. *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79 (2009); *see also Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir.2000) ("[t]his court has consistently held that conclusory allegations without specific

supporting facts have no probative value"). Instead, the evidence of record supports that Williams' injury was a stab wound caused by the inmate attack, not the alleged delay in escorting Williams to the health care unit to receive treatment.

The record further shows that Williams received prompt medical attention and continued to be observed in the health care unit until taken by ambulance to a hospital, within the hour. Under these circumstances, the interrogation of Williams regarding the attack incident in question cannot be viewed as deliberate indifference and did not violate his constitutional rights. Here, the medical care Williams received was not "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to the fundamental fairness", *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991), and there is no evidence that his condition worsened due to any delay in medical treatment. In light of the forgoing, the undersigned finds that Williams has failed to establish a constitutional claim for delay of medical care and Defendant Brown is entitled to qualified immunity on such claim. Thus, it is recommended that summary judgment should be **GRANTED** in favor of **Defendant Brown** as to the allegations asserted against her for denial or delay of medical care following the inmate attack.

### D. Failure to Provide Post-Trauma Care

Williams also alleges in his complaint that, in violation of the Eighth Amendment, he has not received psychological counseling or trauma treatment following the stabbing. To establish his claim, Williams must, again, show that the defendants acted with deliberate indifference. Here, that requires Williams to demonstrate the existence of an "objectively serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need has been described as "one that is diagnosed by a physician as

requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." *Fernandez v. Metro Dade Police Dep't*, 397 F. App'x 507, 511-512 (11th Cir. 2010) (citation omitted). "In either of these situations, the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'" *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000)). The subjective component of Plaintiff's Eighth Amendment claim generally "inquires whether the officials acted with a sufficiently culpable state of mind." *Sims*, 25 F.3d at 983-84 (citing *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). The Supreme Court has declared that an official must have acted with deliberate indifference to a risk to implicate the Eighth Amendment. In defining "deliberate indifference," the Supreme Court in *Farmer* stated:

> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. *See e.g., LaMarca v. Turner*, 995 F.2d 1526, 1535 (CA11 1993)…. It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

*Farmer*, 511 U.S. at 836. Thus, the Court concluded that the "subjective recklessness" standard of criminal law is the test for "deliberate indifference" under the Eighth Amendment. *Id.* at 839-40. Under this test, there is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not . . . ." *Id.* at 838. It is not enough that an inmate proves that the defendant should have known of the risk, but did not, as actual knowledge is the key. *See, e.g., Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996).

While the court interprets Williams' *pro se* complaint with leniency and liberally construes it, a court does not have "license . . . to rewrite an otherwise deficient pleading [by a *pro se* litigant] in order to sustain an action." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (internal citations omitted), *overruled in part on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Williams's complaint, as he authored it, fails to demonstrate either prong of a deliberate indifference claim. Specifically, Williams has failed to establish that he suffered an objectively serious medical need. The pleadings are completely void of observable physical symptoms or emotional symptoms to which Williams claims Defendants were deliberately indifferent. He has not described a specific time frame or duration of symptoms, nor has he discussed suffering from any specific post traumatic issue, including shaking, crying, nightmares, paranoia, hallucinations, anxiety, depression, difficulty sleeping, flashbacks, etc. Moreover, Williams does not allege that he ever informed Defendants he needed treatment following the incident.

Because Williams has offered no evidence to suggest he had a serious medical need that, if left unattended, would pose a serious risk of medical harm, or that Defendants knew of a serious medical need and ignored it, he has failed to meet his burden of proof on this claim. Accordingly, it is recommended that summary judgment be **GRANTED** in favor of Defendants on his claim for failure to provide post trauma care, and the claim be dismissed.

## IV.    CONCLUSION.

Based on the foregoing, the undersigned **RECOMMENDS** that summary judgment should be:

1. **GRANTED** in favor of Defendant Thompkins, and he should be **DISMISSED** from this action;

2. **DENIED** as to **Defendants Dunn, Stewart, Bolar, and Brown**, as to the failure to protect claims;

3. **GRANTED** in favor of **Defendant Brown** as to the denial/delay of medical care claim;

4. **GRANTED** in favor of Defendants as to the denial of post-traumatic medical care, and this claim should be **DISMISSED;** and

5. **GRANTED** in favor of Defendant D. Winner, and he should be **DISMISSED** from this action**.**

It is further **RECOMMENDED** that Defendants Dunn, Stewart, Bolar, and Brown be ordered to respond to Plaintiff's discovery request within 30 days of the order adopting this Report and Recommendation by mailing the responses to Plaintiff and by filing the responses in this Court. After a review of the responses, the Court will determine if further discovery is warranted and, if so, will enter an appropriate order.

The instructions that follow contain important information regarding objections to the report and recommendation of the Magistrate Judge.

N<small>OTICE OF</small> R<small>IGHT TO</small> F<small>ILE</small> O<small>BJECTIONS</small>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. GenLR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to

factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **16th** day of **February, 2022**.

<u>/s/ P. Bradley Murray</u>
**P. BRADLEY MURRAY**
**UNITED STATES MAGISTRATE JUDGE**